FILED          ENTERED
LODGED          RECEIVED

OCT 0 2 2025

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND NORTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 1515 Wyncote Circle, Severn, MD 21144; The PERSON of Meciah Aeden MAHON; and A Red 2012 Nissan Versa, Four Door Hatchback | Case No.  1:25-mj-02260 1:25-mj-02261 1:25-mj-02262 |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Bryce T. Wolford, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I am a Special Agent with the Department of the Army Criminal Investigation Division ("DACID") and have been since April 2018.  I am currently assigned to the DACID Cyber Field Office - Investigations Squad, where I am responsible for investigating cybercrimes.

3.      I have received specialized training in cyber-based investigations, including the Defense Cyber Investigations Training Academy courses; Introduction to Cyber Investigations; Introductions to Networks and Computer Hardware; Network Intrusion Basics; Windows Forensic Examiner; and Forensic Intrusions in a Windows Environment. I have also completed the FBI Cyber Investigator Certificate Program.

4.      I have conducted and participated in numerous investigations involving cybercrimes. During these investigations, I have conducted searches, seizures, and arrests.  I have also conducted multiple interviews of members of criminal organizations and developed information and expertise using various investigative techniques.  Through this training and experience, I have become familiar

1

with the methods and techniques used by individuals to promote and facilitate unlawful activity, including but not limited to the use of electronic devices to conduct computer-related crimes.

## PURPOSE OF AFFIDAVIT

5.     This affidavit is made in support of an application for a warrant to search the PREMISES known as 1515 Wyncote Circle, Severn, MD 21144 (hereinafter "PREMISES"), the PERSON of Meciah Aeden MAHON ("PERSON" or "SUBJECT"), and a red 2012 Nissan Versa, four door Hatchback, Florida license plate 58CHCL, VIN 3N1BC1CP3CK223972 (hereinafter "VEHICLE") further described in Attachment A1-3, for the things described in Attachment B, as they relate to the violations of 18 U.S.C. Section 1030 (a)(5),  Damage to a Protected Computer.

6.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is a court of competent jurisdiction as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated 18 U.S.C. § 2711(3)(A)(i).

## Background on Digital Intrusions

8.     From my training and experience, I am familiar with the following terms which are pertinent to this investigation:

2

9.    Computer. A computer is an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

10.    Computer hardware. Computer hardware consists of all equipment, which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, mobile telephones, video gaming devices, portable electronic music players, laptop computers, tablet computers, desktop computers, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

11.    Computer software. Computer software is digital information, which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

12.    Computer-related documentation. Computer-related documentation consists of written, recorded, printed, or electronically stored material, which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

13.    Computer passwords and data security devices. Computer passwords and data security devices consist of information or items designed to restrict access to or hide computer software,

3

documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

14.     Internet Service Providers (ISPs). ISPs are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone-based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name – a username or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an ISP over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

15.     IP address: An Internet Protocol (IP) Address is a unique numeric address used to identify computers on the Internet.  Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination.  IP

4

addresses are typically assigned by Internet service providers ("ISP"), such as Verizon, Google Fiber, or other ISPs. An ISP might assign a different IP address to a customer each time the customer makes an Internet connection (so-called "dynamic IP addressing"), or it might assign an IP address to a customer permanently or for a fixed period of time (so-called "static IP addressing"). In both scenarios, the IP Address used by a computer attached to the Internet must be unique. ISPs typically log their customers' connections, which means the ISP can identify which of their customers was assigned a specific IP address during a particular session.

16.    Log files. The term "log files" refers to computer-generated files containing information regarding the activities of computer users, processes running on a computer, and the activity of computer resources. A typical web server log file would contain information about the web site name being requested, if the request was successful, the user's IP address, and the date and time that the request was completed, among other pieces of information. It is frequently also possible for the customer to directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the Internet Protocol addresses ("IP addresses") of the remote users' computers (IP addresses are used to identify computers connected to the Internet). Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

17.     Server.  A server is a computer that provides a service for other computers connected to it via a network.  When, for example, a user accesses email or an Internet web page, those files are pulled electronically from the server where they are stored and are "served up" or sent to the user's computer via the network or the Internet.  Notably, servers can be physically located in any location, for example, it is not uncommon for a network's server to be located hundreds of miles away from the user's computers.

18.     Network Port. A network port provides a means for a computer to connect and direct network communications to a running application.

19.     Ephemeral Port. An ephemeral port is a temporary network communication endpoint used for short-lived connections in internet protocols.

20.     SSH Protocol. SSH (Secure Shell) is a network protocol that provides a secure channel over an unsecured network in a client-server architecture. It allows users to securely access, control, and manage remote systems and servers by encrypting all communication between the client and the server.

21.     FTP.  File Transfer Protocol (FTP), is a standard network protocol used to transfer files between a client and a server on a computer network. It operates on a client-server model, where a client (like a computer) connects to a server (a remote computer) to upload or download files. FTP is widely used for tasks like website development, file sharing, and data backup.

22.     Telnet logs. Telnet logs are records of communication sessions conducted using the Telnet protocol. These logs capture the data exchanged between a Telnet client and a Telnet server, including commands, responses, and any data transmitted during the session. They are useful for troubleshooting, auditing, and security analysis of Telnet connections.

23.    Denial of Service (DOS) Attack. A Denial of Service (DOS) attack is a cyber-attack that aims to make a computer or network resource unavailable to its intended users. It works by overwhelming the target with traffic, requests, or data, thereby consuming its resources and preventing legitimate users from accessing the service. Businesses often face direct costs from DOS attacks, including lost revenue, fines for violating service level agreements (SLAs), and overtime payments to employees for remediation, and defensive measures. This can include hidden costs, such as a drop in stock value and damage to the company's brand or reputation.

24.    Botnet. A botnet is a network of private computers infected with malicious software that is controlled as a group without the owner's knowledge to execute tasks.

25.    Malicious software. Malicious software, often shortened to malware, is any software designed to harm or exploit computer systems, networks, or users. It includes a variety of harmful programs like viruses, worms, Trojans, ransomware, and spyware. These programs can steal data, disrupt operations, or even take complete control of infected systems.

26.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as

well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## Training and Experience on Digital Devices

27.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

       a.   Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500-gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files,

9

or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited,

10

or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment and also can require substantial time.

f.  Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.

11

g.  Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

## Background on iRacing

28.     iRacing is a subscription-based online simulation racing video game developed and published by iRacing.com Motorsport Simulations in 2008. All in-game sessions are hosted on the publisher's servers. The game simulates real world cars, tracks, and racing events, and enforces rules of conduct modeled on real automotive racing events. The iRacing game is a computer-based simulation racing platform that requires specific system requirements and controllers. However, there is a free iRacing smartphone application available for both Apple and Android devices, which allows users to manage their iRacing account, view upcoming races, and access news. The application

12

provides access to manage your iRacing account, view your licenses, statistics, and race results. The business is incorporated in the state of Delaware with branches in multiple states including Florida. The company has servers dispersed throughout the United States and international servers.

29.     iRacing's business computers and servers meet the statutory definition of 18 USC § 1030(e)(2) as they are 'used in or affecting interstate or foreign commerce or communication' to run their business and include users from around the world.

## PROBABLE CAUSE

30.     On July 11, 2024, iRacing reported to the Internet Crime Complaint Center (IC3) that an individual ("SUBJECT") executed multiple Denial of Service (DOS) attacks[1] against their business. iRacing expressed concern that the SUBJECT was potentially an Army Cyber Operator executing attacks on a US company or that the SUBJECT's equipment had been compromised. iRacing reported that as a result of the attacks, the company was unable to operate as a business. iRacing staff reported that they had to divert company resources to defend against the DOS attacks against their business and it was impacting paid subscriber's access to their platform. iRacing staff reported the attacks and interrupted service interferes with future customer sales as customers and prospective customers cannot gain access to the website.

31.     On August 29, 2024, the Federal Bureau of Investigation (FBI) initiated a Guardian report to investigate this incident. On October 3, 2024, the FBI referred the Guardian report to DACID, Cyber Field Office, which revealed iRacing reported an estimated total loss of $150,000.

---

[1] A Denial of Service Attack is a malicious attempt to shut down, disrupt, or otherwise harm the normal functioning of a targeted server, service, or network, making it unavailable to legitimate users. *See* https://www.paloaltonetworks.com/cyberpedia/what-is-a-denial-of-service-attack-dos and https://www.cisa.gov/news-events/news/understanding-denial-service-attacks (last visited 11 Mar 2025).

32.    On October 7, 2024, DACID retrieved supporting documents from iRacing, which revealed the usual pattern for a user connecting to a race on iRacing's website is as follows:

    a.    A user registers for and joins a race session.

    b.    The race session will be set-up on a specific server with a contact port.

    c.    The user will be directed to connect to that contact port, where it will negotiate for an ephemeral port dedicated to that user for the remainder of the session.

    d.    The ephemeral port is where the rest of the user's traffic is sent to/from. This is the port that was targeted in the DOS attack.

33.    The DOS attack methodology occurred after a race was initiated and connected and a connection to the ephemeral port had been established. Once this connection was established, the malicious IP addresses began overwhelming the iRacing servers with traffic, requests, and data usage, thereby consuming its resources and preventing legitimate users from accessing the service. A common DOS attack pattern involves more than one machine or computer to send malicious traffic to the target. Many times, the devices recruited into the attack are part of a botnet (a collection of computers or other internet connected devices infected with malware) that can be remotely controlled by the attacker. This reasonably could have been the methodology in the iRacing attacks. iRacing reported during each attack instance that their servers received an overwhelming amount of traffic which disrupted and halted normal operations and caused their customers to lose access to the sites and their accounts. The DOS attack timeline occurred as follows:

    a.    Attack 1: July 3, 2024, from 23:28-23:30 (UTC)

        i.    Target/Victim Internet Protocol (IP) address: 67.218.1.13 (bosrace13)

        ii.    Customer/Attacker IP: 24.126.14.35

4

    iii. Session: 242874380

  b. Attack 2: July 4, 2024, from 01:02-01:04 (UTC)

    i. Target/Victim IP: 67.218.1.21 (bosrace21)

    ii. Customer/Attacker IP: 174.172.111.93

    iii. Session 242877593

  c. Attack 3: July 4, 2024, from 02:30-02:32 (UTC)

    i. Target/Victim IP: 67.218.1.13

    ii. Customer/Attacker IP: 174.172.111.93

    iii. Session: 242885789

  d. Attack 4: July 4, 2024, from 04:08-04:10 (UTC)

    i. Target/Victim IP: 67.218.1.4

    ii. Customer/Attacker IP: 174.172.111.93

    iii. Session: 242892380

  e. Attack 5: July 4, 2024, from 23:07-23:13 (UTC)

    i. Target/Victim IP: 67.218.1.3

    ii. Customer/Attacker IP: 174.172.111.93

    iii. Session: 242974158

  f. Attack 6: July 4, 2024, from 23:35-23:43 (UTC)

    i. Target/Victim IP: 67.218.1.21

    ii. Customer/Attacker IP: 174.172.111.93

    iii. Session: 242976327

  g. Attack 7: Jul 6, 2024, from 06:01-06:10 (UTC)

     i.     Target/Victim IP: 67.218.1.15

     ii.    Customer/Attacker IP: 24.126.14.155

     iii.   Session: 243107459

h.  Attack 8: July 6, 2024, from 17:55-18:04 (UTC)

     i.     Target/Victim IP: 67.218.1.7

     ii.    Customer/Attacker IP: 174.172.111.93

     iii.   Session: 243164073

i.  Attack 9: July 6, 2024, from 17:51-17:54 (UTC)

     i.     Target: https://members-ng.iracing.com

j.  Attack 10: July 6, 2024, from 17:48-18:02 (UTC)

     i.     Target: https://www.iracing.com

k.  Attack 11: July 11, 2024, from 18:50-unknown

     i.     Target/Victim IP: 67.218.1.7

34.    IP History Logs provided by iRacing regarding the SUBJECT's known customer account and previous IP records for legitimate account usage, demonstrated he logged in from the following IP addresses:[2]

a.  174.172.111.93

b.  24.126.14.103

c.  24.126.14.35

d.  24.126.15.246

[2] The IP addresses listed in subparagraphs c and d do not appear to have been utilized in the DOS attack, however their consistent use in connection with the iRacing account provided additional attribution to investigators.

6

     e.   24.126.14.155

35.      On October 8, 2024, DACID Special Agents interviewed iRacing Senior Developer Operations Engineers who stated the DOS attacks occurred on July 3, 2024, and continued almost daily through July 6, 2024. To join a race, users log into a contact port and are subsequently assigned to their own individual port called a dedicated (ephemeral) port, prior to joining the racing server. While investigating the attacks, iRacing engineers observed that the same few IP addresses logged into the contact ports before the attacks began. Engineers analyzed their network traffic and logs, which contained an overwhelming amount of traffic from the attacker's IP addresses, and compared the IP addresses responsible for the attacks to search for any customers operating with the same IP addresses within their logs. iRacing located user data which revealed a customer account frequently operating on the same IP addresses as the attacker's IP addresses. The username for that customer was meciah1017@gmail.com, with Display Name Meciah Mahon, and it was logged in with the same IP addresses as those responsible for the attacks during each of the attacks. iRacing employees conducted additional research into the online presence of Meciah Mahon, which allowed them to identify SUBJECT as Meciah Aeden Mahon, which matched the customer information on file as their customer. Following the identification of SUBJECT, iRacing blocked SUBJECT's account. After SUBJECT's       account       was       blocked,       two newly       created accounts (using the email addresses jacobreese217@outlook.com and     iracing2701@outlook.com) were used to facilitate DOS attacks against iRacing. Investigation into the additional DOS attacks revealed they originated from the same IP addresses as the previous DOS attacks.

36.      U.S. Army personnel records revealed SUBJECT's military occupational specialty is a 17C, which is commonly known as a cyber operations specialist. SUBJECT is assigned to the "C

7

Company, Cyber Battalion" located at Fort Meade, MD. The Army education for 17C provides training on foundational knowledge regarding cyber operations, including cyber-attacks and defenses, cyber intelligence, penetration testing, cybersecurity breaches, hacking procedures, and coding.

37.    Research into the IP addresses DACID Special Agents received from iRacing indicated the IP addresses were registered with Comcast Cable Communications (Comcast). On October 25, 2024, DACID served Comcast with a DODIG Subpoena. Comcast's subpoena production revealed the IP address 174.172.111.93 was leased to SUBJECT from July 1, 2024, until July 12, 2024. A review of the Xfinity Wifi History for the account provided by Comcast tied the SUBJECT account to the IP addresses 24.126.14.35 and 24.126.14.155 on the dates of the DOS attacks. Subscriber data provided by Comcast listed SUBJECT'S address as 6402 Zimborski Ave. Unit 108B, Fort Meade, MD 20755.

38.    On July 24, 2025, investigators coordinated with the Building Manager for Fort Meade Barracks building 6402 Zimborski Ave, Fort Meade, MD 20755, who provided documentation stating that SUBJECT occupied 6402 Zimborski Ave. Unit 304A, Fort Meade, MD 20755, from January 11, 2024, until October 15, 2024, when he was given authorization to move off of the military installation. Research revealed three additional personnel share the new residence with SUBJECT. Subsequent to SUBJECT'S relocation to 1515 Wyncote Cir., MD 21144, a Special Agent from Fort Meade CID conducted surveillance of the residents, during which a red Nissan Versa matching the description of the vehicle registered to SUBJECT was observed in the driveway. DACID pulled IP activity logs from SUBJECT'S Army Office 365 account, which revealed on December 27, 2024, and January 1, 2025, SUBJECT logged onto Army Office 365 from Verizon FIOS (business) IP address 173.67.11.116, out of Severn, MD. DACID obtained department of defense personnel records completed by SUBJECT

8

which included a signed request to the Fort Meade military finance office for a financial housing allowance. SUBJECT's request attested his residence as of October 15, 2024, was "1515 Wyncote Cir. Severn, MD 21144" (PREMISES) as his home address.  SUBJECT submitted the document which was endorsed by his military commander.

39.     The DOS attacks could have originated from any device located within Unit 304A, 6402 Zimborski Ave, Fort Meade, MD 20755, however, records indicated that the attacks occurred from SUBJECT'S personal iRacing account affiliated with his payment information and personal email address. Moreover, the units within the barracks are comprised of two rooms, and a shared bathroom space. SUBJECT likely logged into his account from his personal device(s) in order to execute the attacks on iRacing. Based on my training and experience, I know that individuals are likely to take their electronic devices with them when they move.

40.     On August 7, 2025, DACID investigators obtained a court order issued by a United States Military Judge for information from Microsoft regarding the outlook email address. On August 13, 2025, pursuant to that court order, DACID investigators learned iracing2701@outlook.com utilized the IP address 174.172.111.93, at about "2024-07-10T20:39:08.000Z."

41.     In conclusion, I submit there is probable cause to believe that an individual, using an electronic device, committed violations of 18 USC 1030 – Damage to a Protected Computer; that this individual was SUBJECT; and that records and information associated with that criminal activity will be found on one or more of his electronic devices located at the PREMISES, on the PERSON, or in the VEHICLE described in Attachment A1-3 of this affidavit.

### Unlocking the Device(s) with Biometric Features

42.     The search authorization I am applying for would permit law enforcement to compel "SUBJECT" to unlock a device subject to seizure pursuant to this search authorization using the device's biometric features. I seek this authority based on the following:

    a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

    c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face

10

registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

11

f.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this search authorization is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this search authorization.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of

the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

i.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to seizure pursuant to this search authorization and may be unlocked using one of the aforementioned biometric features, the search authorization I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of "SUBJECT" to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of the same individual and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of the same individual and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this search authorization.

**CONCLUSION**

13

43.    Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

Bryce T. Wolford
Special Agent
DACID

Subscribed electronically and sworn to telephonically before me this 3rd day of September, 2025.

Honorable Erin Aslan
United States Magistrate Judge

14